**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**JAMES G.,**[1]

      **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

**Case No. 3:21-CV-01070-NJR**

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### BACKGROUND

Plaintiff applied for benefits in October 2018, alleging disability beginning on October 24, 2017. After holding a hearing, an Administrative Law Judge (ALJ) denied the application in October 2019. (Tr. 741-750). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 754). Plaintiff filed a timely complaint, and Magistrate Judge Sison reversed and remanded on August 25, 2020. (Tr. 762-778).

A new ALJ held hearings in February 2021 and June 2021. (Tr. 697-737). The new

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

ALJ denied the application in June 2021. (Tr. 679-691). Accordingly, Plaintiff exhausted administrative remedies and filed a timely complaint.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1.    The ALJ failed to follow the prior remand order by failing to account for Plaintiff's concentration deficit within the residual functional capacity (RFC) findings.

2.    The ALJ erred by relying on vocational expert (VE) opinion testimony as to job incidence data that lacked a reliable basis.

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order:  (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant

is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**1. Evidentiary Hearings**

Plaintiff was represented by an attorney at the hearing in February 2021. (Tr. 711). At the hearing, Plaintiff amended his onset date to December 4, 2017. (Tr. 716). Plaintiff explained he served in the Marine Corps from 2005 to 2009. Plaintiff's "main conditions have been [obsessive-compulsive disorder] [(OCD)], general anxiety disorder, as well as bipolar." (*Id.*). Plaintiff testified that it is very hard to concentrate. (Tr. 721). He explained that his OCD behaviors started back in 2008 while a Marine. (Tr. 722). By 2010, his problems got to the level he now suffers from.

After serving in the Marines, Plaintiff bounced around from a number of jobs. In 2012, he was a binary operator. (Tr. 719-720). As a binary operator, Plaintiff was in charge of five to ten people who would insert pages into different books. (Tr. 720).

A VE also testified. The ALJ asked her a hypothetical question which corresponded to the RFC assessment—would there be work at any exertional level for an individual limited to work involving routine tasks, simple-work-related decisions, no interaction with the public, occasional interaction with coworkers, occasional decision-making, occasional changes in the work setting, work that allows for flexible pace (no fast paced work such as work on an assembly line), work that allows someone to be off task less than 10 percent of the workday, with the same age, education, and work experience

as Plaintiff. (Tr. 731-733). The VE testified that there are approximately 80,000 light cleaner or housekeeper positions nationally, approximately 15,000 light laundry worker positions nationally, and approximately 25,000 medium hand packer positions nationally. (Tr. 733). The ALJ also asked the VE about the impact of being 10 percent or more off task. (Tr. 732). The VE confirmed that an individual who is 10 percent or more off task "would be terminated after a short period of time." (*Id.*).

After the hearing, Plaintiff's attorney reviewed the VE's hearing testimony and objected to the VE's opinions "as to job incidence data lack a reliable methodology." (Tr. 907). Plaintiff's attorney argued, "[t]here is no specific confirmable methodology described in the record, and no evidence that the VE's methods for obtaining job incidence data are reliable and well-accepted, or why that is so." (*Id.*).

As a result of Plaintiff's objection, the ALJ held a supplemental hearing in June 2021. (Tr. 699). A new VE testified. The ALJ asked her a hypothetical question which corresponded to the RFC assessment. The VE testified there would be approximately 30,000 medium-unskilled laundry worker positions nationally, approximately 150,000 medium-unskilled industrial cleaner positions nationally, and approximately 50,000 medium-unskilled machine cleaner positions nationally. (Tr. 705-706). The ALJ also asked the new VE about the impact of being 10 percent or more off task. (*Id.*). The new VE confirmed that anything over 10 percent off task "would not be tolerated on an ongoing basis." (Tr. 706).

### 2. Medical Records

In 2008, while serving as a Marine, Plaintiff was diagnosed with bipolar disorder

after "he punched his Gunny Sargent during an argument." (Tr. 329). Plaintiff explained "[he] was hyper focused on the behaviors of other Marines." (*Id*.). After seeking mental healthcare in 2012, Plaintiff started reestablishing care again in 2017. *James M. G. v. Comm'r of Soc. Sec.*, 2020 WL 5016790, at *3 (S.D. Ill. Aug. 25, 2020).

In January 2017, Plaintiff reported that he has been "struggling with [OCD] [and] [anxiety symptoms] throughout his life." (Tr. 323). At that time, he had participated in minimal therapy. (*Id*.). He noted he washed his hands dozens of times per day. (*Id*.). In September 2017, Plaintiff reported that his OCD symptoms increased as he was checking on his door locks and the light in his refrigerator. (Tr. 402). He was still worried "about a lot of different things." (*Id*.). During his exam, Chaitanya Ravi, M.D. ("Dr. Ravi") recorded that Plaintiff's concentration and recall were intact. (Tr. 404).

By December 2017, Plaintiff reported that his OCD symptoms have decreased in frequency since increasing his dose of Clomipramine. (Tr. 386). Plaintiff reported that he "gets through his daily routine with basic needs, denied having nightmares, plan[s] to apply for SSD, says he cannot work because he is too tired." (*Id*.). During his exam, Dr. Ravi recorded that Plaintiff's concentration and recall were intact. (Tr. 388).

In April 2018, Plaintiff reported increased stress. He had been staying at his house, stopped therapy, reported memory problems, and experienced increased irritability. (Tr. 378). "[He] stated he needs help with anxiety and irritability." (Tr. 379). During his exam, Daniel Murray, M.D. ("Dr. Murray") noted that Plaintiff's concentration and recall were intact. (Tr. 380).

In June 2018, Plaintiff reported that he was doing well mentally. He was still

checking door locks, but his handwashing decreased. (Tr. 373). The increase in the Paroxetine dose was helping with anxiety. (*Id*.). During his exam, Dr. Ravi recorded that Plaintiff's concentration and recall were intact. (Tr. 374).

In September 2018, Plaintiff reported worsening symptoms of OCD over the last two months. "[H]e ha[d] started to spend more time 'double and triple checking: lock, doors, faucets, [and] the oven.'" (Tr. 366). He reported spending about three hours per day on his checking behavior and the rest of his time organizing and cleaning. (*Id*.). He reported a significant increase in his anxiety. On average, he would have low mood two days a week, but otherwise he felt "like [he] [was] on top of the world, like [he] [was] bullet proof." (*Id*.). He reported "panic attack like symptoms" in a Wal-Mart and rarely left the house except to go grocery shopping. (*Id*.). At the exam, Plaintiff's attention, concentration, and memory were normal. (Tr. 367).

In November 2018, Plaintiff reported his "concerns about his memory and [said] he is 'constantly forgetting things and [he] feel[s] like it's getting worse.'" (Tr. 360, 597). Plaintiff's checking behaviors improved. For instance, he was checking the door 10 times a day—down from 40 times a day. (*Id*.). Plaintiff communicated that "his biggest goal of treatment is 'not to worry so much, everyone tell[s] [him] [he] [is] a worry wart and [he] worr[ies] about everything . . . ." (*Id*.). At the exam, Plaintiff's attention, concentration, and memory were normal. (Tr. 361).

In December 2018, he felt his OCD behaviors were slowly getting better on medication. (Tr. 352, 498). He was checking locks on his door frequently, but he was checking the gas on the stove less than three times a day. (*Id*.). Plaintiff noted "[h]e still

has issues with memory/forgetfulness." (*Id*.). During the December 2018 exam, he was alert and had good concentration with normal attention. (Tr. 353).

In January 2019, Plaintiff told a VA psychiatrist that he was doing "really good, way better . . . the best [he] [had] been in a long time." (Tr. 346, 493). He was "only" checking the locks about 10 times a day, down from 40, and he was not checking the gas. During his exam, Plaintiff's attention, concentration, and memory were normal. (Tr. 347).

In July 2019, Plaintiff was very happy with his reduced anxiety and OCD behaviors, but reported that he feels his memory continues to decline. (Tr. 669-670). At the exam, Plaintiff's concentration, attention, and memory were normal. (Tr. 670).

In August 2019, Dr. Murray noted that there is "no clear need for neuropsychology review at this point." (Tr. 975). During the exam, Plaintiff's attention, concentration, and memory were normal. (Tr. 975-976). In October 2019, Dr. Murray noted that Plaintiff's concentration remains poor. (Tr. 967). Plaintiff continued to have frequent lock checking behaviors, and he explained that he still worried excessively about small things. (*Id*.). At the exam, Plaintiff's attention, concentration, and memory were normal. (Tr. 968).

In November 2019, Plaintiff reported he was doing better than he was at his last appointment with Dr. Murray. (Tr. 961). He felt that he had better control of his anger, but he continues to have frequent checking behavior of locks and gas stove. (*Id*.). Dr. Murray observed that Plaintiff's concentration, attention, and memory were normal. (Tr. 962).

In March 2020, the VA called Plaintiff because Dr. Murray was deployed out of the country and COVID-19 was impacting the VA's operations. (Tr. 958). Plaintiff reported

that his mental status was the same as the November 2019 appointment and he was doing well. (*Id*.).

In September 2020, Plaintiff reported that he was no longer checking the door 150 times a day—and it was down to around 10 times a day. (Tr. 952). He noted that his reduced checking behavior gave him more time to do things in the day. (*Id*.). At the exam, Plaintiff's attention, concentration, and memory were normal. (Tr. 953).

In March 2021, Plaintiff reported "dramatic worsening of mood and anxiety in the last two months despite no new stressors." (Tr. 1000) Plaintiff did not report memory or attention issues. In both March and April 2021, Dr. Murray observed that Plaintiff's concentration, attention, and memory were normal. (Tr. 1001, 1025). In May 2021, Plaintiff had been feeling "good." (Tr. 1019). His new prescriptions had been helpful in reducing some of his OCD behaviors. (*Id*.). Dr. Murray observed that Plaintiff's concentration, attention, and memory were normal. (Tr. 1020).

### 3. State Agency Consultants' Mental RFC Assessment

In March 2019, Howard Tin, Psy.D, ("Tin") assessed Plaintiff's mental RFC based on a review of the record. Tin indicated that Plaintiff had moderate difficulties in interacting with others and in concentrating, persisting, and maintaining pace. (Tr. 102). Tin further indicated that Plaintiff had sustained concentration and persistence limitations. (Tr. 104). According to Tin, Plaintiff's ability to carry out detailed instructions and maintain attention and concentration for extended periods was moderately limited. (*Id*.). Tin wrote, in part, "Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the

person is capable of performing simple tasks." (Tr. 105). He also wrote, "Claimant is capable of performing one and two-step tasks." (Tr. 106).

About two months later, M. W. DiFonso, Psy.D., the second state agency consultant, agreed with Tin's opinion. (Tr. 114-121).

## DECISION OF THE ALJ

The ALJ followed a five-step sequential evaluation process for determining whether Plaintiff is disabled. (Tr. 680). The ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period from his amended alleged onset date of December 4, 2017, through his date last insured of September 30, 2019. (Tr. 682). The ALJ also found that through the date last insured, Plaintiff had the following severe impairments: bipolar disorder, anxiety disorder, and OCD. (*Id*.).

The ALJ found that Plaintiff had the RFC to perform "a full range of work at all exertional levels but with non-exertional limitations." (Tr. 684). These limitations include:

a) work involving simple-routine tasks and simple work-related decisions;

b) work that involves no interaction with the public;

c) work that involves occasional interaction with coworkers, occasional decision-making, and occasional changes in the work setting;

d) work that allows for a flexible pace and he should not perform any fast-paced work such as work on an assembly line; and

e) work that allows for an individual to be off-task less than 10 percent of the workday.

(*Id*.). The ALJ found that through the date last insured, Plaintiff was unable to perform any past relevant work. (Tr. 689). In conclusion, based on the new VE's testimony, the

ALJ found that Plaintiff was not disabled because considering his age, education, work experience, and RFC, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

**DISCUSSION**

**I.      Failing to Follow the Prior Remand Order, and Again Failing to Account for Deficits of Concentration, Persistence, or Pace in the RFC**

According to Plaintiff, "[w]ithout citation to evidence supporting the 10 percent figure, and based on a record establishing nothing other than 10 percent being the cutoff between [Plaintiff] winning or losing—the ALJ added 'will be off-task less than [10] percent of the workday' to the [RFC] finding." (Doc. 12, p. 6). Plaintiff notes that "[n]ot only did this Court's remand demand more substantive correction than mere 'minor alterations in wording,' but this Court's concern was about the nature of type of the RFC limits—that they were disconnected from the form of [Plaintiff's] concentration impairment." (*Id.*).

However, the ALJ accounted for Plaintiff's deficits of concentration, persistence, or pace in the RFC. The ALJ explained:

> [H]is moderate limitation in concentration, persistence or maintaining pace is addressed by limiting him to work that allows for a flexible pace and a prohibition against performing any fast-paced work such as work on an assembly line. In light of his OCD symptoms, the claimant will be off-task at times but for less than [10] percent of the workday. The claimant's ability to perform his activities of daily living, help care for his roommate's son, and his recent adoption of a dog, are consistent with his ability to perform the type of work described in the residual functional capacity.

(Tr. 688). This is different than the prior ALJ who found that "Plaintiff has moderate limitations in maintaining concentration, persistence, or pace, but failed to account for

that limitation in the RFC assessment and the hypothetical question." *James M. G.*, 2020 WL 5016790 at *6.

In *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017), the Seventh Circuit found that "the ALJ made no effort to 'build an accurate and logical bridge,' . . . between the 'no more than 10%' finding and the psychologists' general assessment that [the plaintiff] exhibits moderate difficulty in areas like the 'ability to maintain attention and concentration for extended periods' and the 'ability to perform activities within a schedule.'" Indeed, *Lanigan* stands for the proposition that remand is required when an ALJ fails to explain why he or she concludes that a plaintiff would be off-task less than 10 percent of the time. However, in *Lanigan*, there was evidence of the plaintiff's need to take "unscheduled breaks (sometimes for 20 minutes) three to five times during his five-hour shifts at [work]." *Id.* Also, the Seventh Circuit pointed out that "the ALJ did not explain why he gave more weight to the opinions of the state-agency psychologists than he did to [the plaintiff's] long-time counselor . . . . ." *Id.*

Unlike the evidence in *Lanigan*, here Plaintiff has not come forward with evidence that he needs to take breaks. Additionally, unlike *Lanigan*, Plaintiff does not argue that the ALJ failed to explain why more weight was given to the opinions of the state-agency psychologists. This is significant because "remand is required only if the ALJ's error was material." *Tanya C. v. Kijakazi*, 2021 WL 5769310, at *3 (E.D. Wis. Dec. 6, 2021) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)). A plaintiff must point to evidence that he would be off task to a degree that would preclude work. *See Barker v. Saul,* 2021 WL 856938, at *3 (E.D. Wis. Mar. 8, 2021) ("It is unnecessary to consider the merits of [the

plaintiff's] arguments because [the plaintiff] has not shown she was harmed by any alleged error—that is, she has not shown that she would have been off task more than [10] percent of the workday"); *Shaw v. Kijakazi*, 2022 WL 45030, at *5 (N.D. Ill. Jan. 5, 2022) (rejecting the plaintiff's argument that the ALJ failed to explain how plaintiff would not be off-task greater than 10-percent of the workday because "unlike in *Lanigan*, where there was evidence of plaintiff's need to take breaks, no such evidence [existed] [ ]. . . [and] [p]laintiff [did] not point the Court to any part of the record indicating that [p]laintiff would likely be off task for more than 10% of the time"); *Ball v. Saul*, 2019 WL 3334658, at *3 (W.D. Wis. July 25, 2019) (distinguishing *Lanigan* "because the plaintiff in that case pointed to evidence that he would be off-task more often than the amount found by the ALJ[,] [but] [plaintiff] cite[d] no evidence or even identifie[d] a reason why she would be off-task more than 10 percent of the work day"); *David E. v. Saul*, 2019 WL 4034496, at *5 (N.D. Ill. Aug. 27, 2019) (denying the plaintiff's argument because "[w]hile an ALJ may be obliged to explain why he rejected evidence that a claimant would be off-task a greater percentage of time than the ALJ found [ ], [p]laintiff [ ] neither cite[d] such evidence nor even argue[d] that he would be off-task to a greater degree"); *see also Eva M. S. v. Kijakazi*, 2022 WL 2867093, at *2 (N.D. Ill. July 21, 2022) (noting that the plaintiff's argument that the ALJ improperly concluded that she would not be off task more than 15 percent of a workday was "nothing more than a request that the Court reweigh the evidence").

    Here, Plaintiff neither provides evidence that he would have been off task more than 10 percent of the workday nor argues that the ALJ failed to explain why more weight

was given to certain opinions. Accordingly, Plaintiff's first argument must be denied.

## II.   Relying on VE Opinion Testimony as to Job Incidence Data that Lacked a Reliable Basis

Plaintiff argues the "ALJ made no finding as to the reliability of the methodology used by the VE in obtaining job incidence data." (Doc. 12, p. 12). According to Plaintiff, the "VE testified the source for her job incidence data was 'Occupational Employment Quarterly' adjusted by her personal experience with 'types of jobs I've come across in my occupation.'" (*Id*.). Plaintiff notes that the VE's job incidence data opinion was "elicited during the hearing and did not require that an objection bring the issue to the ALJ's attention." (*Id*.). Plaintiff points out that "[his] attorney had alerted the ALJ to the problem following an earlier hearing, noting 'no specific confirmable methodology' and a lack of a reliable basis." (*Id*. at pp. 12-13). Plaintiff concedes that his attorney did not repeat the objection after the second hearing, but still argues "the issue was plainly raised." (*Id*. at p. 13).

The Commissioner argues that "Plaintiff waived his right to object to the [VE's] testimony." (Doc. 16, p. 10). According to the Commissioner, "[i]t is well established that a plaintiff must challenge a VE's methods for estimating job numbers at the hearing level or else forfeit his objection." (*Id*.) (citing *Chavez v. Berryhill*, 895 F.3d 962, 970 (7th Cir. 2018) ("Before accepting a VE's job-number estimate, the ALJ, *when confronted by a claimant's challenge*, must require the VE to offer a reasoned and principled explanation.") (emphasis added)); (citing *Coyier v. Saul*, 860 F. App'x 426, 427-28 (7th Cir. 2021) ("However, Coyier waived any challenge to the VE's testimony by failing to ask any questions to reveal

shortcomings in the job number estimates or to submit a supplemental brief on the issue . . . These omissions effectively conceded the reliability of the VE's job numbers.")).

District courts within the Seventh Circuit have addressed whether a plaintiff's failure to object about the VE's job estimates at the hearing before the ALJ constitutes waiver. In *Desotelle v. Kijakazi*, 2022 WL 409184 (E.D. Wis. Feb. 10, 2022), the plaintiff's counsel only made a non-specific objection to the VE's testimony prior to the hearing— and then asked the following two questions:

    1)  What is the source of the numbers that you've listed for these jobs?

    2)  What's the methodology that you use?

*Id*. at *5. When the VE offered her explanation, the plaintiff's counsel neither made an objection nor asked additional questions. *Id*.

The plaintiff in *Desotelle* argued that "because the ALJ has a duty at step five to ensure the reliability of the vocational testimony under *Chavez*, a plaintiff does not need to do anything to raise the issue on appeal in the district court." *Id*. at *6 (noting that "[i]n other words, [plaintiff] asserts that a represented claimant can stay completely silent as to the reliability of the VE's methodology during the administrative proceedings and then subsequently raise the issue before the district court").

The district court in *Desotelle* disagreed and discussed *Coyier*, quoting the following language:

> On appeal Coyier argues that at step five a claimant needs to object only to some aspect of the expert's method used to arrive at his job-number estimate to trigger the ALJ's duty to ensure the reliability of the VE's methodology. She claims that the ALJ erred by not scrutinizing the VE's methodology. *However, Coyier waived any challenge to the VE's testimony by*

> *failing to ask any questions to reveal shortcomings in the job-number estimates or to submit a supplemental brief on the issue despite assuring the court prior to and at the hearing that he would do so. These omissions effectively conceded the reliability of the VE's job numbers.*

860 F. App'x at 427–28 (emphasis added). The plaintiff's counsel in *Desotelle* also argued that the "the Supreme Court's decision in *Carr v. Saul*, 141 S. Ct. 1352 (2021) stands for the proposition that given the nature of Social Security disability hearings, claimants need not raise *any* issue before the ALJ to preserve the issue on appeal." *Desotelle*, 2022 WL 409184 at *6. The court in *Desotelle* quickly disposed of this argument by acknowledging the following:

> *Coyier* was decided subsequent to *Carr* and as such, the Seventh Circuit was presumably aware of the Court's decision. Furthermore, given *Carr's* narrow holding, it does not supersede the Seventh Circuit's rejection of [plaintiff's] argument in this case. As such, the ALJ did not err in relying on the VE's numbers in this case.

*Id.* at *7.

About a month after *Desotelle*, the district court in *Leisang v. Kijakazi*, 2022 WL 970151 (W.D. Wis. Mar. 31, 2022), was faced with a similar issue when a plaintiff "fail[ed] to object and develop an argument about the VE's estimates at the hearing before the ALJ." *Id.* at *8. In *Leisang*, "[b]efore the hearing, plaintiff's counsel submitted a brief at the administrative level in which he made only a non-specific objection to the VE's expected job-numbers testimony." *Id.* At the hearing, the plaintiff's counsel asked these questions:

Q: Okay. What sources do you utilize in order to estimate your job numbers?

A: These are Occupational Employment Quarterly, First Quarter 2020 data.

> Q: Okay . . . What methodology does the Occupational Employment Quarterly utilize in order to estimate job numbers?
>
> A: It utilizes the equal distribution method over the 840 SSC jobs, categories.
>
> Q: The Bureau of Labor Statistics gathers the data by sending out classification codes, correct?
>
> A: That's correct.
>
> Q: Does the OEQ . . . break that down by Dictionary of Occupational Titles code or is that just something that you do based upon the number of codes, DOT codes that are within the particular SOC code?
>
> A: They do it.
>
> Q: Do you believe that to be a reliable method of estimating job numbers in the national economy?
>
> A: It's the only method I have available to myself.

*Id.* After this explanation, the plaintiff's counsel failed to make any objection.

The plaintiff in *Leisgang* "contend[ed] that counsel's questions at the hearing were sufficient to 'challenge' the reliability of the VE's testimony and trigger the ALJ's duty under *Chavez* to further question him about the reliability of his job numbers before accepting the testimony." *Id.* at *9 (noting that "[i]n plaintiff's view, he needed only to inquire 'about the numbers and the method' used by the VE in order to provoke further inquiry by the ALJ"). The court disagreed, finding that "[t]his argument, however, has already been made and rejected by this court and the Seventh Circuit." *Id.* (citing *Coyier*, 860 F. App'x 426). The court in *Leisgang* did not stop there, but instead acknowledged:

> Here, the ALJ did not offer counsel the opportunity to submit supplemental briefing after the hearing, but counsel never asked for one. *Indeed, although counsel's questions suggested that he was challenging the reliability of [the] [VE's]*

> *job numbers, he never made any specific objection or asked the ALJ to disregard the numbers for lack of reliability. All counsel did was establish that [the] [VE] had relied on the OEQ and confirmed that the OEQ relied on the equal distribution method.* As the Seventh Circuit made clear in *Coyier*, however, "*Chavez* did not enjoin the use of the equal-distribution method and created no new obligations at step five . . . the ALJ was entitled to accept an expert's testimony that was uncontradicted and otherwise proper[.]" *Coyier*, 860 F. App'x at 428 (internal quotations and citations omitted). *See also Surprise v. Saul*, 968 F.3d 658, 662 (7th Cir. 2020) (explaining that an ALJ may properly accept a VE's uncontradicted testimony absent obvious internal conflicts).

*Id*. at *9 (emphasis added). The court then held that "[h]aving failed to identify any specific shortcomings in the VE's job-numbers estimates at the hearing, plaintiff cannot contest the reliability of those numbers now." *Id*.[2]

Here, Plaintiff's counsel objected to the old VE's testimony from the February 2021 hearing. (Tr. 907). Plaintiff's objection noted the following:

> The VE's opinions as to job incidence data lack a reliable methodology. There is no specific confirmable methodology described in the record, and no evidence that the VE's methods for obtaining job incidence data are reliable and well-accepted, or why that is so. The record is unacceptably vague, and this fails to satisfy the Commissioner's burden at step five.

(*Id*.). The ALJ found the objection valid. (Tr. 679). As a result, the ALJ held a supplemental

---

[2] The court in *Leisgang* also addressed the plaintiff's argument that the "Supreme Court held in *Carr v. Saul*, 141 S. Ct. 1352 (2021), that social security disability claimants need not raise an issue before the ALJ to preserve it on appeal." *Id*. at *10. The court found that this argument fails for two reasons:

> First, the Seventh Circuit decided *Coyier* after the Supreme Court decided *Carr*; presumably, the Seventh Circuit was aware of the Court's decision. Second, the Court made clear in *Carr* that it was considering whether to impose an issue-exhaustion requirement only "[i]n the specific context of petitioners' Appointments Clause challenges," 141 S. Ct. at 1360, and was *not* considering "the sphere of routine objections to individual benefits determinations" like the one plaintiff raises here. *Id*.

hearing in June 2021—and had a new VE testify.[3] The ALJ confirmed that Plaintiff's

counsel had no objection to the new VE. (Tr. 704). Then Plaintiff's counsel asked the new

VE two questions at the June 2021 hearing:

> **Q: If the individual was going to need to be redirected at least six times per day, would that have any effect on their past work or any other work?**
>
> A: Okay. So, well typically, you know, in these simple, routine, repetitive jobs that I gave first, you know, the person should be able to receive the instructions and then after a brief period of time, you know, after the training period is over, be able to come in each day, you know, and perform the job and not have to be reinstructed or redirected necessarily.
>
> I mean, there could be some slight changes that would be mentioned, but to me if the person has to actually be redirected six times per day every day, you know, after an initial training period, in my experience that would be closer to a sheltered employment type setting and wouldn't be, you know, necessarily tolerated in a competitive setting, in my experience.
>
> **Q: All right. And if the individual would require two additional breaks per day 15 minutes each, would that affect their ability to maintain any jobs?**
>
> A: Yes. It would be my experience that would not be tolerated. My experience is if there is an off-task time, you know, for a person to use the restroom or get a drink of water, you know, for a variety of things, you know, tie a shoe, straightening contacts, cleaning glasses, you know.
>
> But if a person would actually need additional breaks, for example in your hypothetical, two additional 15-minute breaks, in my experience, that would not be tolerated on an ongoing basis. If this person in the hypothetical got those extra breaks then other employees would want to.
>
> It would be too hard for the employer to keep track of everything with those additional breaks, so in my experience, no, it would not be tolerated.

(Tr. 708-709).

---

[3] Susan Shea was the VE at the February 2021 hearing. (Tr. 711). Carma Mitchell was the VE at the June 2021 hearing. (Tr. 697).

Like the plaintiffs in *Desotelle* and *Leisgang*, Plaintiff's counsel never made a specific objection or asked the ALJ to disregard the numbers for lack of reliability at the June 2021 hearing. The Seventh Circuit has repeatedly reminded courts and counsel, however, that district court opinions have no precedential value. *See, e.g., Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457–58 (7th Cir. 2005).[4] Thus, exploring whether Plaintiff's failure to object about the new VE's job estimates at the June 2021 hearing constitutes waiver is necessary for the Court's analysis.

Distinguishing the facts in *Coyier*—and arguing *Coyier* is inapplicable—would ignore the overarching critical issue. Indeed, the critical issue is that a plaintiff waives any challenge to a VE's testimony by not asking any questions to reveal shortcomings in the job-number estimates or filing a supplemental brief on the issue. Here, Plaintiff's counsel only challenged the *old* VE's testimony from the February 2021 hearing. Then at the June 2021 hearing, Plaintiff's counsel failed to ask any questions to reveal the *new* VE's shortcomings in the job-number estimates or file a supplemental brief on the issue.[5] Accordingly, this argument also must be denied.

## CONCLUSION

After careful review of the record as a whole, the Court finds that ALJ committed no errors of law, and his findings are supported by substantial evidence. Accordingly,

---

[4] *Desotelle* and *Leisgang* are on appeal, and briefing is not complete.

[5] Unlike the plaintiffs in *Desotelle* and *Leisgang*, Plaintiff's counsel neither asked about the new VE's source for the job numbers nor the new VE's methodology. In other words, even if *Desotelle* and *Leisgang* are reversed and remanded, the Seventh Circuit's ruling may be inapplicable because the questions asked in those cases were different than the questions asked by Plaintiff's counsel.

the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  August 16, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**